**Earl R. WRIGHT, Sr., Katherine M. Wright, Burr Wright and Byron Wright, Plaintiffs,**

v.

**The NATIONAL BANK OF STAMFORD, Einar Eklund, John H. Friedmann and Govern, McDowell & Becker, Defendants.**

No. 83–CV–528.

United States District Court,
N.D. New York.

Jan. 2, 1985.

Jordan & Walster, Rural Legal Rights Foundation, Inc., Roxbury, N.Y., for plaintiffs; Herbert Jordan, Roxbury, N.Y., of counsel.

Kernan & Kernan, P.C., Utica, N.Y., for defendants Govern, McDowell & Becker; John E. Hunt, Utica, N.Y., of counsel.

Hancock & Estabrook, Syracuse, N.Y., for defendant The Nat. Bank of Stamford, Einar Eklund and John H. Friedmann; Doreen A. Simmons, Syracuse, N.Y., of counsel.

MINER, District Judge.

This action, alleging various federal constitutional deprivations, arises out of a defaulted loan and a private lender's attempt at collection through repossession of collateralized property. The action is brought pursuant to 42 U.S.C. § 1983, and jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343. Before the Court is a motion by the defendant law firm Govern, McDowell & Becker ("GM & B") for summary judgment, Fed.R.Civ.P. 56(b), as well as a motion by defendants The National Bank of Stamford ("Bank"), Einar Eklund and John

H. Friedmann for summary judgment, Fed. R.Civ.P. 56(b).[1]  Oral argument on the motions was heard by the Court on June 22, 1984.  Decision was reserved pending the submission by the parties of then untranscribed deposition transcripts.  The final submissions of the parties were received by the Court on August 28, 1984, and the Court was advised of such by plaintiffs' counsel on September 6, 1984.[2]

## II

Plaintiffs Earl and Katherine Wright own a dairy farm in Roxbury, New York. Plaintiffs Burr and Byron Wright are two of Earl and Katherine's adult sons, residing and working on the farm.  Defendants Eklund and Friedmann are respectively President and Vice-President of defendant Bank, located in Delaware County, New York. Defendant GM & B is a law partnership serving as counsel to the Bank.  One of the firm's partners, Robert H. McDowell, was a member of the Bank's Board of Directors and owned a large share of its stock.  He also held the office of County Attorney for Delaware County.  Another partner, Carl F. Becker, held the post of Assistant County Attorney.

In connection with the operation of their farm, Earl and Katherine, in 1977, opened a line of credit at the Bank.  In that same year, they signed security agreements collateralizing various farm equipment and their dairy stock.  The security agreements provided that any sale of collateral without the Bank's consent would constitute default, and in the event thereof, the Bank would retain all remedies available under the Uniform Commercial Code.

In 1979, plaintiffs' dairy herd became infected with mastitis.  Pursuant to New York law, seriously infected animals were required to be removed from the herd in order to avoid contaminating the milk supply and the other animals.  By August of 1980, plaintiffs removed a majority of the animals from the herd, sold them for salvage, and replaced them with healthy animals.  The sums received from the salvage sales were insufficient to replace all of the removed animals by outright purchase of healthy cows, and, therefore, plaintiffs replaced some of their herd with leased animals.  According to the complaint, plaintiffs kept Bank officials aware of these events.

On August 13, 1980, Earl and Katherine executed a promissory demand note for $143,204.89, representing a consolidation of their total indebtedness to the Bank.  According to plaintiffs, there also was executed a new security agreement which allegedly superseded the 1977 agreements. Unlike the earlier agreements, the 1980 agreement is said not to have specified sale of collateral as a grounds for default.[3]

The Bank had become aware of plaintiffs' sale of cattle and considered the note in default.  It demanded payment on November 21, 1980, but was refused.  On November 25th, on behalf of its client, GM & B prepared and served a summons and complaint on Earl and Katherine, demanding immediate possession of all the collateral.  Also served was an Order to Show

---

1. These defendants have moved in the alternative for an order compelling the production of certain documents pursuant to Fed.R.Civ.P. 37(a).  In light of the within disposition of the summary judgment motions, however, a decision on this issue is unnecessary.

2. By letter dated December 18, 1984, plaintiffs' counsel sought to "remind" the Court that a decision on the within motions has been pending nearly six months and that his clients are in their 70's and in very poor health.  The Court too, is troubled by how long disposition of this action has been pending.  Counsel, however, doubtless needs himself to be reminded that decision on these motions was withheld at *his*

request pending the belated submission of deposition transcripts after the close of discovery. Those submissions were not received and the Court notified of such until the 6th of September.

3. This theory of a "new" security agreement has already been rejected in the New York State court litigation in which plaintiffs were involved.  *See National Bank of Stamford v. Wright,* 101 A.D.2d 963, 964, 477 N.Y.S.2d 710, 712 (3d Dep't), *permission to appeal denied,* No. 46095 (3d Dep't Nov. 14, 1984).  That determination is, of course, entitled to res judicata effect here.  *See infra* IV(B)(1).

Cause, returnable the following day, temporarily restraining Earl and Katherine from disposing of any other collateral. Because of the short notice, plaintiffs were unable to retain counsel to appear on their behalf on the return date of the Order to Show Cause. They themselves appeared, however, and the court granted the Bank its requested injunction, restraining plaintiffs' sale of any collateral.

That evening (November 26th), defendant Friedmann, accompanied by Carl Becker of GM & B and two uniformed deputies of the Delaware County Sheriff's Office, arrived at the Wright farm with a cattle truck. According to defendants, Friedmann and Becker went to the farm for the purpose of securing the remaining cattle pursuant to the Bank's "common law rights as a secured creditor and the aforesaid security agreement." Simmons affidavit, ¶ 14. The law firm requested the presence of the deputies allegedly in fear of possible violence or breach of the peace. According to the complaint, "[o]ver the objection of plaintiff Earl Wright, and over the telephonic objection of his counsel, agents of the bank under the direction of Carl F. Becker and defendant Friedmann entered and remained upon plaintiffs' property and loaded nine of plaintiffs' cows onto the truck." Complaint, ¶ 44.

Twenty-one days had now elapsed since plaintiffs had been served with the summons and complaint on November 25, 1980, and plaintiffs had yet to hear from their counsel. New counsel was retained, who received a two day extension of time—until December 17th—to answer the complaint. On December 18, 1980, one day after the extended time to answer had expired, GM & B applied for and obtained an ex parte default judgment. The order awarded to the Bank possession of various chattels, including the nine previously repossessed cows. According to the complaint, that order was based upon defendants' representations that the Bank's rights were governed by the 1977 security agreements rather than the 1980 agreement which assertedly would have disclosed to the judge that plaintiffs had substantial defenses to the Bank's claim.

On December 19th, plaintiffs retained new counsel, who managed to obtain a stay of execution of the judgment and who moved by Order to Show Cause to vacate the default. That application was denied and the stay was dissolved on January 2, 1981.[4] That same day, GM & B, acting in lieu of the county clerk pursuant to N.Y. Civ.Prac.Law § 5230(b), see infra note 10, prepared a writ of execution and delivered it to the sheriff. Pursuant to that writ, deputy sheriffs and defendants Eklund, Friedmann and GM & B appeared at plaintiffs' farm and removed the remaining cows and most of the remaining equipment and machinery. Most of these items were later sold at public auction. On January 12, 1981, Earl and Katherine Wright filed a petition for bankruptcy.

This rather prosaic factual background lays the predicate for a host of constitutional and state law challenges. First, plaintiffs claim that the actions of defendants on November 26, 1980 "in entering plaintiffs' property without judicial warrant in the company of armed and uniformed officers of the state, and remaining there and seizing plaintiffs' cows without plaintiffs' consent and over protest, were unlawful in that ...,"

---

**4.** In denying the application to vacate, the Supreme Court Justice found that plaintiffs herein had failed to set forth facts which would support their denials or defenses to the complaint. A second motion to vacate on the grounds that the judgment was obtained through fraud, misrepresentation and misconduct and that the judgment was void for lack of jurisdiction, was similarly denied by order dated September 23, 1983. By a unanimous decision dated May 24, 1984, the Appellate Division, Third Department, affirmed both of those orders finding no meritorious defenses to the Bank's action for repossession and finding no evidence that the judgment was procured by fraud or misrepresentation. Permission to appeal that decision to the New York Court of Appeals was denied on November 14, 1984. See National Bank of Stamford v. Wright, 101 A.D.2d 963, 477 N.Y.S.2d 710 (3d Dep't), permission to appeal denied, No. 46095 (3d Dep't Nov. 14, 1984).

(a) they constituted an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments ...;

(b) they deprived plaintiffs Earl and Katherine Wright of their property without due process of law ...;

(c) insofar as Section 9–503 of the New York Uniform Commercial Code purportedly authorized defendants' actions, the said statute is invalid because it conflicts with the Fourth Amendment and the Due Process Clauses of the Fourteenth Amendment and the Constitution of New York;

(d) they constituted trespass upon plaintiffs' real property and trespass to plaintiffs' chattels ...;

(e) they constituted conversion of plaintiffs' property ....

Complaint, ¶ 71. Additional federal constitutional claims include the assertion that the December 19, 1980 default judgment was procured by fraud in violation of the due process clause of the fourteenth amendment and that it was granted and enforced without due process in that plaintiffs received no notice of the application for it. "Count II" of the complaint seeks redress for defendants' seizure and subsequent sale of a John Deere bulldozer, allegedly owned by plaintiff Burr Wright, in satisfaction of the judgment against his parents.

### III

■ On motions for summary judgment, the Court's function "is not to resolve issues of fact but to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom the judgment is sought. Only if no material factual issues exist may summary judgment be granted." *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *see also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319 (2d Cir.

1975). Although the moving party bears the burden of clearly establishing the non-existence of any issue of fact that is material to a judgment in his favor, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970), the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e); *In re B.D. International Discount Corp. v. Chase Manhattan Bank, N.A.*, 701 F.2d 1071, 1077 n. 11 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

As will be clear from the discussion below, plaintiffs have failed to come forward with any factual matter supporting their claimed constitutional deprivations. Plaintiffs have been content to rely merely on allegations which echo those contained in the complaint and which are without a scintilla of meaningful factual support. Accordingly, for the reasons set forth below, defendants' motions for summary judgment must be granted.

### IV

■ The threshold inquiry in a § 1983 action is twofold. The Court must consider both whether the conduct complained of was committed by a person acting under color of state law as well as whether that conduct deprived a person of rights privileges or immunities secured by the Constitution. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). After careful review of the undisputed facts which underly plaintiffs' complaint, this Court is persuaded beyond any doubt that neither of these threshold showings has been made.

## A. *Color of State Law*

It must first be noted that none of the defendants themselves are state officials.[5] Nonetheless, "[a]ction taken by private individuals may be 'under color of state law' where there is 'significant' state involvement in the action." *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir.1983). Plaintiffs rely on a number of allegations to support their various theories of state involvement. That reliance, however, is a strained one; there is neither legal nor factual merit to any claim of state involvement sufficient to support a § 1983 action.

According to plaintiffs, there are five factors which compel a finding of color of state law. First, plaintiffs point to defendants' enlistment of the aid of the Sheriff to facilitate the seizure of the nine cows on November 26, 1980. Second, plaintiffs argue that the defendant attorneys used their positions as County Attorneys to induce the Sheriff to supply deputies for the seizure. Third, plaintiffs contend that defendants acted pursuant to a state statute, § 9–503 of the Uniform Commercial Code, in seizing the nine cows and selling them. Fourth, plaintiffs claim that the defendant attorneys acted under color of state law when they issued the execution pursuant to N.Y. Civ.Prac.Law § 5230(b). Finally, plaintiffs contend that defendants acted under color of state law in procuring and enforcing the default judgment. These five theories, individually or collectively, are utterly devoid of merit.

### 1. *Presence of the deputies*

The undisputed facts here amply support the conclusion that the presence of the deputies on the evening of the repossession falls far short of creating action under color of state law. First, it must be noted that even assuming the truth of plaintiffs' claim that the defendant attorneys used their positions as County Attorneys to induce the Sheriff to supply deputies, that fact alone will not support a finding of color of state law.[6] The appropriate inquiry must be directed to what, if anything, the deputies did once their involvement was procured. If that involvement is in itself insufficient to establish state action, the mere fact that the defendant attorneys used their official capacity to recruit them is irrelevant.

A review of the deposition transcripts and various affidavits makes it clear that the participation of the two deputy sheriffs in the repossession of the cows was so insignificant that as a matter of law it cannot be said to supply the necessary color of state law. At the outset, it should be noted that all those who were present at the time of the repossession and who would be available to testify [7] have provided deposition testimony. Since discovery is now closed and no new evidence will be available at trial, summary judgment is particularly appropriate. Plaintiffs have not even suggested that additional testimony or evidence will be offered at trial to controvert the facts thus far established. In sum, their position is simply that "a fact question exists," a convenient but unpersuasive position with respect to these motions. *See In re B.D. International Discount Corp. v. Chase Manhattan Bank, N.A.*, 701 F.2d 1071, 1077 n. 11 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); 10A C. Wright, A. Miller, & M.

---

5. While Carl Becker of the defendant law firm is the County Attorney for Delaware County, the actions herein challenged do not arise out of any official conduct on his part.

6. This is not a case involving a conspiracy between state and private actors to effect a constitutional deprivation. Not only is no conspiracy alleged, but the facts adduced thus far fall short of those required to support such a theory. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983); *Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir.1981).

7. Although counsel for plaintiffs has advised the Court that there is no "stipulation" that plaintiffs Earl and Katherine Wright will not testify at trial, *see* Supplemental Affirmation in Opposition to Motions for Summary Judgment, ¶ 3, there can be no question that neither one is likely to testify. Indeed, defense counsel has been so advised throughout the latter part of these proceedings. *See, e.g.,* Deposition of Govern, McDowell & Becker by Carl F. Becker, Jr., at 61–64.

Kane, *Federal Practice and Procedure*, § 2727, at 157 (1983); *see also Perma Research and Development Co. v. The Singer Company*, 410 F.2d 572, 578 (2d Cir. 1969) ("summary judgment cannot be defeated by the vague hope that something may turn up at trial").

Briefly, the undisputed facts surrounding the evening of the repossession are the following: (1) The two deputy sheriffs were requested by GM & B to meet the Bank party at the Wright farm as a precaution, i.e., to prevent a breach of the peace. *See* Deposition of Deputy Sheriff Charles A. Newman at 5, 11; Deposition of Sheriff Levon Telian at 12–15; Deposition of John H. Friedmann at 57; Affidavit of Carl Becker, ¶ 4; *cf.* Deposition of Helen Groves at 6–7 (policy of Sheriff was to send deputies to repossessions only to keep the peace); (2) Defendant Friedmann and attorney Becker arrived at the Wright farm and entered the home followed by Deputy Newman. The entry was apparently with consent. *See, e.g.*, Deposition of GM & B at 34–35; (3) A conversation ensued between Earl Wright and Messrs. Friedmann and Becker, in which Earl noted his desire to contact his attorney. *See* GM & B deposition at 36; Friedmann deposition at 58; Deposition of Byron Wright at 46; (4) After some time elapsed and Earl was unable to contact his attorney, Becker indicated that they would like to start loading the cows; Earl said "all right" and asked Byron to go to the barn to identify which cows were to be taken. *See* Friedmann deposition at 59; GM & B deposition at 39; Byron Wright deposition at 48; (5) The party proceeded out to the barn to load the cows with some assistance from Byron Wright. *See* Byron Wright deposition at 49–50, 62; GM & B deposition at 39–40; Friedmann deposition at 59–60; (6) The loading proceeded without incident until another son informed the party that Earl had contacted his attorney and now wanted to speak with Becker. *See* GM & B deposition at 41; Friedmann deposition at 60; (7) Becker returned to the house, spoke with Earl's attorney on the phone, and then returned to the barn where the loading of cows was continuing; (8) After Earl finished speaking with his attorney, he sent word out to the barn to stop loading the cows, a directive with which defendants immediately complied. *See* Friedmann deposition at 61–62; GM & B deposition at 43–44; Newman deposition at 16; Byron Wright deposition at 63–64.

What is significant about this scenario, and what is uncontradicted by any evidence, is the total lack of involvement by the deputy sheriffs. Other than their mere presence, they had absolutely no involvement in the repossession. *See* Newman deposition, *passim;* Newman affidavit, *passim;* Telian affidavit, ¶ 3; Byron Wright deposition at 52–53, 56, 60. Plaintiffs have adduced absolutely no evidence to suggest the existence of a factual dispute concerning the deputies' de minimis involvement.

It is of course true that "[a]t some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983). That point, however, has not been approached here. The only evidence in the record is that the deputies were passive onlookers, present only to avert any violence which, considering the circumstances, was reasonably to be anticipated. *See* Deposition of Sheriff Telian at 12–13 (Sheriff had experienced problems with the Wrights in the past). There are no allegations that the deputies actually aided in the repossession. Nor are there allegations that their mere presence somehow assisted in an essentially private undertaking. *See Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir.1981) ("We conclude that there may be a deprivation within the meaning of § 1983 not only when there has been an actual 'taking' of property by a police officer, but also when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession"). Indeed, there could have been no such "intimidation" here, since plaintiffs

eventually insisted that the repossession cease.

■ In short, the officers were merely present throughout the entire operation with the object of preventing a breach of the peace. That exigency never realized, their presence retained its passive character and therefore fell shy of creating action under color of state law. "[W]here state involvement in private action constitutes no more than acquiescence or tacit approval, the private action is not transformed into state action . . . ." *United States v. Coleman,* 628 F.2d 961, 964 (6th Cir.1980).

Plaintiffs place considerable reliance on *Howerton v. Gabica,* 708 F.2d 380 (9th Cir.1983), and distinctions they urge are to be found in contrary cases. Such reliance, however, is unavailing. First, the facts of *Howerton* are sufficiently distinguishable from those present here. That case involved a § 1983 action against a landlord for an allegedly unlawful eviction under a state detainer statute. In reversing the district court's dismissal of the action, the Ninth Circuit premised its holding on the fact that local police officers' *affirmative assistance* in the physical eviction provided sufficient evidence of state action. Indeed, the court noted that the actions of the police "created an appearance that the police sanctioned the eviction." 708 F.2d at 384. Unlike the deputies' conduct here, the Kooskia police officers' conduct in *Howerton* was overwhelmingly sufficient to support a finding of state action. For example, in examining the facts of the eviction, the court noted that the case "involve[d] more than a single incident of police consent to 'stand by' in case of trouble. Police were on the scene at each step of the eviction. Mr. Gabica testified that the police presence gave him the feeling he had the right to cut off the utilities. Moreover, the police officer actively intervened—he privately approached the Howertons and recommended that they leave the trailerhouse." 708 F.2d at 384. No such action may be found here. More importantly, *Howerton* itself arguably suggests that no state action may be found in circumstances

like those present here. First, it reiterated the requirement that there be "significant" state action. 708 F.2d at 382; *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). Second, in distinguishing the facts before it from cases, like the present one, involving lesser state involvement, the court noted that the record before it was "replete with evidence that the Gabicas deliberately cloaked themselves with the authority of the state in effecting repossession . . . ," finding that "the Gabicas repeatedly requested aid by the police to effect the eviction, and the police intervened at every step." 708 F.2d at 384–85. The court was therefore not confronted with "[a] single request for the police to perform their peace-keeping functions [which] may not be sufficient to make a landlord a 'joint actor' with the state for section 1983 purposes." *Id.; see also Dahlberg v. Becker,* 748 F.2d 85 at 92 (2d Cir.1984) (citing *Howerton* with approval).

Defendants rely on *United States v. Coleman,* 628 F.2d 961 (6th Cir.1980), and *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507 (5th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980), both of which found no color of state law. Plaintiffs are correct in noting that both those cases involved somewhat less police participation than was present here. For example, in *Coleman,* the police, who had agreed to "stand by in case of trouble," parked "down the street and around the corner" from the site of the private repossession. 628 F.2d at 963. In *Menchaca,* police did not arrive at the site of the private repossession until after they had been summoned to investigate an ensuing disturbance. The police also left prior to the actual repossession. 613 F.2d at 510. Conceding these factual differences, this Court is nonetheless persuaded that the legal principles embodied in those decisions compel a finding of no state action here. While the deputies here were somewhat less removed from the repossession than were the police in either *Coleman* or *Menchaca,* their conduct nonetheless reflected "mere acquiescence . . . to 'stand by in case

of trouble,' " and was therefore "insufficient to convert the repossession ... into state action." *United States v. Coleman,* 628 F.2d at 964.

Finally, of some note is the decision in *Rizzo v. Host Services of New York, Inc.,* 545 F.Supp. 1193 (E.D.N.Y.1982). There, three employees of defendant Host entered three airport bars which Host operated, and closed them for a surprise audit. Plaintiffs, six bartenders and a waiter then working in the bars, were directed to proceed to Host's management office in the building. One of the Host employees telephoned Port Authority Police, and three officers arrived shortly thereafter. The officers spoke briefly with the Host employee. Apparently,

> [s]ome of the plaintiffs felt that the officers' presence lent credence to defendants' threats of arrest and imprisonment. However, the officers neither touched the plaintiffs nor attempted to prevent them from leaving. Even when defendant Christie, referring to plaintiff Fung, told the officers, "He is under arrest, I want him," the officers did nothing .... Indeed, the officers did not even speak with any of the plaintiffs other than Rizzo and then only to protest that they were not involved with defendants' refusal to allow Rizzo to leave the office in order to make a telephone call.
>
> At approximately 10:30 p.m., the Port Authority police officers told defendant Newman either to press charges or to allow plaintiffs to leave. The police officers then left without making any arrests.[8]

545 F.Supp. at 1194.

In granting defendants summary judgment, dismissing the § 1983 action alleging false arrest, the court found to be clearly lacking any action taken under color of state law. It held:

Had defendants entered into a conspiracy with the police to hold plaintiffs against their will doubtless the "state action" requirement would be fulfilled. But plaintiffs have advanced no proof that the presence of the police was part of a preconceived plan in which they participated. So far as the record shows, they were wholly blameless and took no action to detain plaintiffs. We may assume, without deciding, that plaintiffs remained in the offices in part due to a concern that they might be arrested. But the mere response of a police officer to a citizen's call for assistance is not enough to transmogrify the citizen's action into that of the state. To satisfy the state action requirement plaintiffs would, as a minimum, have to prove that the police were knowingly involved in a plan to deprive plaintiffs of their rights.

To the extent that the presence of the police tended to assist defendants' allegedly unlawful purposes that presence did not establish "state action" any more than does the provision by the state to a litigant of a "neutral" judicial forum.

545 F.Supp. at 1194–95 (citations omitted).

## 2. *Invocation of state procedures*

■ The remaining grounds upon which plaintiffs premise their contention that defendants acted under color of state law are that defendants acted pursuant to a state self-help statute in repossessing the cows, that they acted pursuant to state law when they issued the execution, and that they acted similarly in procuring and enforcing the default judgment. With respect to all these grounds, two points are in order. First, the Supreme Court decision in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), makes untenable any such claims. Second, even if there were merit to this aspect of plaintiffs' complaint, litigation of those claims

---

**8.** The statement by the officers in *Rizzo* that defendants should either press charges or allow plaintiffs to leave, is similar in effect to the statement made here by deputy Newman after Earl Wright indicated his desire that the repossession cease: "That's it. Close it down." Newman deposition at 16. Contrary to plaintiffs' suggestion, neither remark was sufficient to create state action.

here would be barred under principles of res judicata.

Under *Lugar,* the test for state action or action taken under color of state law is twofold:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

457 U.S. at 937, 102 S.Ct. at 2754. In short, a party's "mere invocation" of state procedures will result in a finding of color of state law only if that conduct is fairly attributable to the state. With respect to a state statute or procedure, such attribution may only be given where the statute at issue is challenged as, and found to be, unconstitutional. *See id.* at 937–42, 102 S.Ct. at 2754–57; *Dahlberg v. Becker,* 748 F.2d 85 at 90 (2d Cir.1984); *see also Conway v. Village of Mount Kisco, New York,* 750 F.2d 205 at 214 n. 12 (2d Cir.1984) (citing *id.*); *Dahlberg v. Becker,* 581 F.Supp. 855, 860–62 (N.D.N.Y.), *aff'd,* 748 F.2d 85 (2d Cir.1984).

Although plaintiffs herein challenge the constitutionality of various New York procedures, albeit, with less than precision, those challenges must fail. First, all three challenged procedures clearly are constitutional. Specifically, the self-help remedies contemplated by N.Y.U.C.C. § 9–503 have repeatedly been upheld in the face of con-

stitutional attack. *See, e.g., Gallets v. General Motors Acceptance Corp.,* 96 A.D.2d 756, 757, 465 N.Y.S.2d 319, 320 (4th Dep't), *appeal dismissed,* 60 N.Y.2d 1014, 471 N.Y.S.2d 569, 459 N.E.2d 862 (1983); *Crouse v. First Trust Union Bank,* 86 A.D.2d 978, 978, 448 N.Y.S.2d 329, 330 (4th Dep't 1982). The dearth of analysis offered by plaintiffs provides this Court with little reason to question this well-settled proposition.[9]

With respect to N.Y.Civ.Prac.Law § 3215 and the claim that that provision conflicts with the due process clause, this Court is unable to fathom precisely how New York's default procedures are constitutionally infirm. What is apparent, however, is that although plaintiffs' complaint alleges the unconstitutionality of the statute, the real challenge is to defendants' actions in procuring the default. Misuse of a state statute by a private individual does not, however, describe conduct that can be attributed to the state. *Lugar v. Edmondson Oil Co.,* 457 U.S. at 940–41, 102 S.Ct. at 2755–56; *Dahlberg v. Becker,* 748 F.2d 85 at 90–91 (2d Cir.1984).

Finally, state action is not to be found in the provisions of N.Y.Civ.Prac.Law § 5230(b).[10] There simply is no significance to the fact that in issuing the execution, the attorney is considered, for statutory purposes, to be an officer of the court. An attorney is always thought to be an officer of the court and yet his behavior is generally not thought to be imputed to the state. *See Ragosta v. Vermont,* 556 F.Supp. 220, 225–26 (D.Vt.1981), *aff'd mem.,* 697 F.2d 296 (2d Cir.1982); *Kovacs v. Goodman,* 383 F.Supp. 507, 509 (E.D.Pa. 1974), *aff'd mem.,* 515 F.2d 507 (3d Cir.

---

**9.** It also has been repeatedly held that private self-help under § 9–503 does not give rise to state action. *See, e.g., Shirley v. State National Bank of Connecticut,* 493 F.2d 739 (2d Cir.), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974); *Sciolino v. Marine Midland Bank-Western,* 463 F.Supp. 128, 134 (W.D.N.Y.1979).

**10.** N.Y.Civ.Prac.Law § 5230(b) provides:

Issuance. At any time before a judgment is satisfied or vacated, an execution may be is-

sued from the supreme court, county court or a family court, in the county in which the judgment was first docketed, by the clerk of the court or the attorney for the judgment creditor as officer of the court, to the sheriffs of one or more counties of the state, directing each of them to satisfy the judgment out of the real and personal property of the judgment debtor and the debts due to him.

1975); *Kregger v. Posner*, 248 F.Supp. 804, 806 (E.D.Mich.1966). To hold otherwise would be to impute to the state responsibility for the conduct of each and every one of its "court officers," no matter how far removed from real state action. The procedure invoked here by the attorney is no different than any other variety of self-help procedures and its mere invocation does not constitute the state action necessary to maintain a § 1983 action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. at 438–39 & n. 21, 102 S.Ct. at 2755 & n. 21; *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Because no constitutional infirmity has been alleged nor may be seen to inhere in § 5230(b), plaintiffs have failed to bring their claim within the holding of *Lugar* and their § 1983 claims must fail for want of state action.

### B. *Constitutional Deprivations*

Even assuming that defendants' actions here may be said to have been taken under color of state law, plaintiffs' complaint would still be subject to dismissal for failure to establish the existence of any constitutional deprivation.

#### 1. *Res judicata*

■ First, there can be no question that litigation of any such claims would be barred under principles of res judicata. Last Term's Supreme Court decision in *Migra v. Warren City School District Board of Education*, — U.S. ——, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), requires the federal courts to apply state preclusion law in federal civil rights actions. *Id.*, 79 L.Ed.2d at 896–98. That is, a prior state court judgment is to have the same preclusive effect in a subsequent federal civil rights action as it would have had in the state courts. ■ New York applies a "transactional analysis" approach in deciding res judicata

issues. *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981); *Reilly v. Reid*, 45 N.Y.2d 24, 27–31, 407 N.Y.S.2d 645, 647–49, 379 N.E.2d 172, 174–76 (1978); *see also Heimbach v. Chu*, 744 F.2d 11, 14 (2d Cir. 1984). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse*, 54 N.Y.2d at 357, 445 N.Y.S.2d at 688, 429 N.E.2d at 1159. Unlike collateral estoppel or issue preclusion, *see Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 485–86, 414 N.Y.S.2d 308, 310–11, 386 N.E.2d 1328, 1330–31 (1979), res judicata bars claims that could have been raised but were not. *Heimbach v. Chu*, 744 F.2d at 14; *Winters v. Lavine*, 574 F.2d 46, 56 (2d Cir.1978).

■ A review of the Third Department's May 24, 1984 decision, affirming orders which denied defendants' (plaintiffs herein) motions to vacate their default, *National Bank of Stamford v. Wright*, 101 A.D.2d 963, 477 N.Y.S.2d 710 (3d Dep't), *permission to appeal denied*, No. 46095 (3d Dep't Nov. 14, 1984), makes indisputably clear that all those issues raised by plaintiffs here either were or could have been raised in the New York State courts.[11] Accordingly, res judicata bars their renewed litigation here.

Plaintiffs are incorrect in their contention that their claim regarding a taking of property without due process was not decided by the state courts and is therefore not now precluded. Plaintiffs have confused collateral estoppel, or issue preclusion, with res judicata, or claim preclusion. *Compare O'Brien v. City of Syracuse*, 54 N.Y.2d at 357, 445 N.Y.S.2d at 688, 429

---

**11.** Indeed, even a cursory review of the Third Department's factual recitation reveals a most remarkable similarity between that action and the present one. Particularly noteworthy is the court's comment that "[d]efendants' [plaintiffs herein] continued interest in vacating the default judgment stems from a desire to prevent

that judgment from 'spawning any legal consequences,' such as its possible *res judicata* effect in a damage action defendants have brought in the United States District Court against plaintiff and its counsel [defendants herein] for claimed civil rights violations." 101 A.D.2d at 964, 477 N.Y.S.2d at 712.

N.E.2d 1159 (1981) *with Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d at 486, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979). Because res judicata applies to this claim, arising as it does out of the precise facts as all the others, that is, the same "transaction," the assertion of the claim here is barred. *See Heimbach v. Chu,* 744 F.2d at 14; *Winters v. Lavine,* 574 F.2d at 56.

So too are plaintiffs incorrect in their assertion (erroneously conceded by defendants, *see* Affirmation in Opposition to Motions for Summary Judgment at 10) that the Appellate Division's decision "has no arguable effect on the events on the night of November 26, 1980." It is clear from the December 19, 1980 order signed by Supreme Court Justice Robert Harlem (¶ 5), and the attempted answer and counterclaims dated December 19, 1980 (seventh affirmative defense), that the events of November 26, 1980 were certainly such as could have been raised in the state proceedings and are therefore now barred. "[W]here the same foundation facts serve as a predicate for each proceeding, differences in legal theory and consequent remedy do not create a separate cause of action." *Reilly v. Reid,* 45 N.Y.2d at 28, 30, 407 N.Y.S.2d 645, 649, 379 N.E.2d 172, 176 (1978). There can be no question that the events of November 26th were so intimately connected with the facts underlying the default judgment that plaintiffs were required to raise all claims stemming from them in the state proceedings or later be barred from their litigation. The Appellate Division's factual findings unquestionably preclude the entirety of plaintiffs' present claims.

### 2. *Due process deprivation*

■ According to the complaint, defendants' seizure of the cattle deprived plaintiffs of their property without due process of law. Requiring little argument is the proposition that "[n]othing in [the Fourteenth] Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations 'without due process of law.'" *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (quoting *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Assuming that plaintiffs possessed a property interest in the seized cattle,[12] it is nonetheless clear that any deprivation thereof was not without due process of law.

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court held that the due process clause of the fourteenth amendment is not violated when a state employee negligently deprives an individual of property, provided that the state makes available a meaningful postdeprivation remedy. The Court recognized that "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process." 451 U.S. at 539, 101 S.Ct. at 1914 (footnote omitted). Just last Term, the Supreme Court extended its holding in *Parratt* to situations involving *intentional* deprivations of property. *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Noting that it could "discern no logical distinction between negligent and intentional deprivations of property insofar as the 'practicability' of affording predeprivation process is concerned," *id.,* 104 S.Ct. at 3203,[13] the Court held that

---

**12.** The determination of the existence of a property right will often times necessitate resort to state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In the present case, it is all too clear that in light of their loan default, plaintiffs no longer retained any property interest in the seized cattle. This fact is of course established by the res judicata effect of the state courts' holdings.

**13.** The Court reasoned:

The State can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct. Argu-

"an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Id.* at 3204.

▇▇ *Hudson v. Palmer* makes clear that an intentional deprivation of property, like that alleged here, necessarily makes impractical any predeprivation hearing. A meaningful postdeprivation hearing therefore is all that is required. The availability of a state tort suit, for example, an action for replevin, provided plaintiffs with the necessary due process. *See Vicory v. Walton*, 721 F.2d 1062, 1064–65 (6th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984). Indeed, plaintiffs were equally capable of obtaining state court review of the seizure in the very replevin action in which they were defendants. *See National Bank of Stamford v. Wright*, 101 A.D.2d 963, 477 N.Y.S.2d 710 (3d Dep't 1984). In fact, in that action, these plaintiffs actually sought to interpose a challenge to the seizure in a proposed affirmative defense/counterclaim. Because of their default, however, that challenge was unsuccessful.

### 3. *Fourth amendment violation*

▇▇ Finally, there is no merit to plaintiffs' claim that defendants' actions on the evening of November 26, 1980 constituted an unreasonable search and seizure in violation of the fourth amendment. First, the undisputed facts make clear that defendants' presence on the farm on the evening of the 26th was entirely consensual. *See, e.g.*, Friedmann deposition at 59; Newman deposition at 12–13, 27–28; Byron Wright deposition at 62; Becker deposition at 34–36, 39. Plaintiffs do not point to any facts even suggesting that the Bank party was ever on the premises over their objection. Indeed, the tenor of all the deposition testimony is to the contrary. Significantly, the

depositions reveal that the moment objection was expressed to the party's presence and the seizure of the cows, all activity ceased and the party exited without incident immediately. *See, e.g.*, Newman deposition at 16; Friedmann deposition at 61–62; Byron Wright deposition at 63–64; Becker deposition at 43–44.

Even assuming the existence of a material factual dispute relative to the course of events on the evening of the repossession, there can be no doubt that because the repossession and attendant entry were effected pursuant to the security agreement, that is, the Bank's legal right to take possession of its collateral, the seizure was indisputably consensual. *See Shirley v. State National Bank of Connecticut*, 493 F.2d 739, 741 (2d Cir.), *cert. denied*, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974).

### V

This Court is persuaded beyond any doubt that no disputed issues of material fact exist precluding a grant of summary judgment. Plaintiffs have quite literally offered the Court not one scintilla of factual support to warrant a finding that these defendants acted under color of state law in the course of their purely private and legally justified repossession of the collateralized property. Plaintiffs' election to rest on the mere allegations of their pleadings and an occasional reiteration of those same allegations in their attorney's affidavit is grossly insufficient to withstand the instant motions. Not only have plaintiffs failed to supply the necessary factual support for their allegations of state involvement, but their legal theories as well are entirely devoid of merit. Quite simply, no action taken under color of state law sufficient to support a § 1983 action can be found here. Even if state action were present, there is absolutely no merit to the alleged constitutional deprivations suffered. Having disposed of the federal

---

ably, intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might

well take affirmative steps to avoid signalling his intent.

*104 S.Ct. at 3203.*

claims, the Court, in the exercise of its discretion, chooses to dismiss the pendent state law claims as well. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

On balance, it is clear that the present case is precisely of a type not contemplated by the federal civil rights statutes. "The purpose of imposing private liability under § 1983 was not to bring into a federal court every tort claim with which state officials have some relationship no matter how attenuated. The objective was to discourage private participation in official lawlessness. That objective would not be served by permitting the maintenance of this suit in this court." *Rizzo v. Host Services of New York, Inc.*, 545 F.Supp. 1193, 1195 (E.D.N.Y.1982). Accordingly, defendants' motions for summary judgment are granted and the complaint is dismissed.

It is so Ordered.