**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Ronald James COLEMAN,
Defendant-Appellee.**

No. 79–5236.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 29, 1980.

Decided Aug. 18, 1980.

James S. Brady, U. S. Atty., Grand Rapids, Mich., William C. Bryson, App. Section, Criminal Division, Washington, D. C., for plaintiff-appellant.

James J. Kobza, Muskegon, Mich., for defendant-appellee.

Before CELEBREZZE, KEITH and MARTIN, Circuit Judges.

CELEBREZZE, Circuit Judge.

In the course of repossessing defendant Coleman's truck, the private party conducting the repossession discovered a twelve-gauge shotgun which was handed over to the police who were present at the time. Coleman was subsequently charged in a two-count indictment with possession of a firearm after being convicted of a felony in violation of 18 U.S.C.App. § 1202(a)(1), and possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d), 5871. Prior to trial Coleman filed a motion to suppress the shotgun which formed the basis of the charges against him. After conducting a hearing on this motion, the District Court granted the motion to suppress the shotgun as evidence. For the reasons that follow, we reverse the suppression order.

On January 19, 1978, Richard Clarke, an employee of Midwest Auto Recovery, arrived in Elk Rapids, Michigan, with two companions for the purpose of repossessing appellee Coleman's pick-up truck. At that time Coleman was seven months behind in his payments on the truck. Clarke was conducting the repossession at the authorization and behest of Manufacturer's National Bank of Detroit, pursuant to M.C.A. § 440.9503. This "self-help" provision of Michigan law permits a secured creditor to repossess collateral if the repossession can be achieved without a breach of the peace.

When Clarke arrived in Elk Rapids he was unaware of the location of the truck. As was his usual practice, Clarke contacted the local police department to find out if the police knew where the truck was located. Clarke also asked the police if he could call for assistance in case any trouble arose in the course of the repossession. Clarke had made it his standard operating procedures to contact the local police officials when repossessing a vehicle both for his own protection and so that the police would be aware of the repossession if the owner of the vehicle reported it stolen. The Elk Rapids police informed Clarke that they did not know the location of the truck but that they would stand by in case of trouble.

After leaving the police station, Clarke spotted the truck parked on the side of the road but decided not to seize it at that time because there were people nearby. The next day Clarke located the truck parked in the driveway leading to Coleman's home. At 10:00 p. m. he returned to the police station to inform the police that he had located the truck and was going to repossess it that night. Clarke also noted that after repossessing the truck, he would stop off at the police station to deposit any personal effects of Coleman's that he might find in the truck. Two reasons motivated Clarke to deliver any personal belonging to the police station. First, his authority was limited to repossessing the truck; his authorization did not extend to the seizure of personal property inside the truck. Second, Clarke planned to return the truck to Detroit that evening—a drive of some 200 miles from Elk Rapids. Depositing any personal effects at the police station would

spare Coleman the inconvenience of traveling to Detroit in order to retrieve them.

Clarke then asked the police whether they would park nearby for his protection while he repossessed the truck. The police agreed to do so. After leaving the police station, Clarke drove to his motel to pick up his companions and together they went to Coleman's home. The police followed in their patrol car and parked down the street and around the corner from the Coleman residence. The police remained in their car while Clarke entered the truck, started the engine, and drove away without incident. When he entered the unlocked truck, Clarke noticed open beer cans, a quantity of what appeared to be marijuana on the seat, and the butt end of a rifle protruding from behind the seat. After traveling about one block, Clarke contacted the police by using the truck's C.B. radio to make certain that no one had followed him. He asked the police to rendezvous with him at the police station.

Clarke arrived at the police station several minutes ahead of the officers. When the officers arrived, Clarke told them that he had found a rifle in the truck. He pulled the seat up to show them the gun and then handed the gun to the officers. Clarke then opened a briefcase that he had found in the truck and discovered a shotgun inside that briefcase. Clarke then handed the open briefcase containing the shotgun to the officers.

After finding this shotgun, the police and Clarke decided to take the truck to the police garage for the purpose of conducting an inventory search. After Clarke drove the truck into the garage, the remaining contents were removed and inventoried. Clarke then drove the truck back to Detroit.

The District Court founded its suppression order on the conclusion that the shotgun was seized pursuant to an unlawful search. Although the court acknowledged that a secured party may lawfully take possession of collateral after default, it concluded that any police participation in the repossession would render the repossession unlawful, at least absent prior notice to the debtor and an opportunity to be heard. Because the police had agreed to "stand by in case of trouble" during the repossession, the court held that the repossession "was effected by virtue of state power." The court then concluded that the seizure was not the product of a private search; rather, it was the product of official action that brought the search within the ambit of the fourth amendment. Having found violations of both the fourth and fifth amendments, the court suppressed the shotgun.

■ The clearly erroneous standard of review contained in F.R.Civ.P. 52(a) applies to factual findings in a criminal case by a district judge considering a motion to suppress evidence. *United States v. Breen*, 419 F.2d 806 (6th Cir. 1969); *United States v. Rose*, 415 F.2d 742 (6th Cir. 1969), *cert. denied*, 396 U.S. 971, 90 S.Ct. 458, 24 L.Ed.2d 438 (1970). Here the district court concluded that Clarke would not have repossessed the truck at the time and place he did *but for* the police assurances of assistance. Finding that the collaboration between the police and Clarke was manifested in the "specific active involvement of state officers in the repossession of the truck," the court held that the repossession was accomplished by virtue of state power. Since we conclude that the district court's factual finding underlying its legal conclusion is clearly erroneous, we reverse the holding that the repossession was the product of state action.

The well-established law in this circuit is that the private creditor who alone repossesses secured collateral does not act under color of state law. Specifically, self-help repossession under U.C.C. § 9–503 does not constitute state action. *Gary v. Darnell*, 505 F.2d 741 (6th Cir. 1974); *Turner v. Impala Motors*, 503 F.2d 607 (6th Cir. 1974); *see also Northrip v. Federal Mfg. Ass'n.*, 527 F.2d 23, 26–28 (6th Cir. 1975); *Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602, 608 (9th Cir. 1977).

■ Our starting assumption must be that Clarke's repossession was purely private action. The question is whether there

are sufficient indicia of official involvement so as to convert the repossession into state action. More than official acquiescence is needed for such a conversion. *Flagg Bros. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) illustrates that where state involvement in private action constitutes no more than acquiescence or tacit approval, the private action is not transformed into state action even if the private party would not have acted without the authorization of state law. Indeed, under the standard articulated by the Supreme Court in *Flagg Bros.*, the actions of a private party will not be attributed to the state unless the state actually compels the action.

▉ The involvement of the police here falls far short of compulsion. The police neither encouraged nor directed Clarke to repossess the truck in a particular manner. Their presence at the scene was not an indispensible prerequisite for repossession of the truck. Their benign attendance was not designed to assist Clarke in repossession of the truck; rather, it was in furtherance of their official duties.[1] The position assumed by the police was devised to anticipate and prevent any violent confrontation between debtor and creditor which repossession of collateral can entail. Under the facts of this case, mere acquiescence by the police to "stand by in case of trouble" was insufficient to convert the repossession of the truck into state action.

The issue remaining for decision is whether the "search" which resulted in the warrantless seizure of the shotgun was a private search (and, therefore, not governed by the Fourth Amendment) or a search by law enforcement officials subject to the warrant and probable cause requirements of the Fourth Amendment. In passing on this issue, we note as relevant the Supreme Court's observation that "an apparently small difference in the factual situation frequently is viewed as a controlling difference in determining Fourth Amendment rights." *Arkansas v. Sanders*, 442 U.S. 753, 757, 99 S.Ct. 2586, 2589, 61 L.Ed.2d 235 (1979). We are convinced that upon the facts matrix of the present case no violation of Fourth Amendment rights occurred.

The repossession of Coleman's pick-up truck was a wholly legitimate seizure of collateral by a private party. Authority to seize the truck did not, however, encompass dominion over the personal belongings inside the truck. Since Clarke had no legal right or title to Coleman's personal effects, he planned to deposit them at the police station so that Coleman might conveniently retrieve them. In an exercise of their community care-taking functions the police agreed to keep the personal effects until Coleman claimed them.

After taking possession of the truck, Clarke drove to the police station, arriving several minutes ahead of the police. Troubled by his discovery of the rifle and what appeared to be marijuana, Clarke waited for the police to arrive so that he could turn these, as well as all the other articles in the truck, over to the police. When the police joined Clarke, they were shown the rifle when Clarke pulled the seat forward. While the police remained outside the truck, Clarke seized the briefcase, opened it to reveal a shotgun, and handed it through the window to the police. The District Court held that because the seizure of the truck was the product of police action, the subsequent search was not a private search.

▉▉ Long ago the Supreme Court acknowledged in *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) that the Fourth Amendment proscribes only governmental action, and does not apply to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or

---

1. *Walker v. Walthall*, 121 Ariz. 121, 588 P.2d 863 (1978) and *Stone Machinery v. Kessler*, 1 Wash.App. 750, 463 P.2d 651 (1970), relied upon by the district court, are distinguishable from this case. In those cases the local police accompanied the repossessor to the debtor's residence, and together with the repossessor, confronted the debtor in order to effectuate the repossession. The affirmative participation by the police sets those cases apart from the passive surveillance of the police here.

with the participation or knowledge of any governmental official. *See also Walter v. United States*, —— U.S. ——, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *United States v. Rodriguez*, 596 F.2d 169, 172–73 (6th Cir. 1979). Where a motion to suppress evidence has been made, the burden of establishing that the evidence was secured by an unlawful search is on the moving party. *United States v. Freeland*, 562 F.2d 383, 385 (6th Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977). To establish an unlawful search here, Coleman must demonstrate that the search was not a private search even though Clarke alone actively searched the truck. The test is whether Clarke, in light of the circumstances of this case, must be regarded as having acted as an instrument or agent of the state when he found the shotgun. *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Both sides rely on this court's decision in *Cash v. Williams*, 455 F.2d 1227 (6th Cir. 1972), but not surprisingly draw different conclusions therefrom. In *Cash* the defendant was arrested for reckless driving and taken to the police station. The police then directed a wrecker operator to tow and store the defendant's vehicle until its release was authorized. After towing the car to his garage, the operator began searching the automobile for the purpose of finding evidence of ownership so that he might know who to bill for the towing charges. While seated in the car he discovered a brown paper bag under the seat. He opened the bag and found a brownish grassy substance which he could not identify. He also found more of the same substance in the pockets of an army field jacket belonging to the defendant. The operator then summoned a deputy sheriff who was also unable to identify the grassy substance. At the deputy sheriff's request, another police agent arrived and confirmed that the paper bag and field jacket contained marijuana. A further extensive search of the car was then made by the deputy and the agent which uncovered additional marijua-

na. At no time was a search warrant obtained authorizing the search of the automobile. Because the police had been called to the scene to assist in and complete the search, this court held that although the operator's initial search was a purely private search, the subsequent searches involving law enforcement officials had to be measured against fourth amendment strictures forbidding unreasonable searches.[2] Significantly, the court rejected the defendant's argument that the wrecker operator was acting as an agent of the police. Even though the wrecker operator had received prior instructions from the police, it was not until the police actively participated in the search of the car that the constraints of the fourth amendment came into play.

 In the instant case, the police actions were insufficient to trigger application of the fourth amendment. Although there was antecedent contact between the police and the private party, it was not directed toward a search of the truck. The police actions constituted "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). Since the police did not instigate, encourage, or participate in the search of the truck, the search by Clarke was outside the scope of the fourth amendment. *See United States v. Bomengo*, 580 F.2d 173 (5th Cir. 1978) (after chief engineer of apartment complex searched defendant's apartment and uncovered firearms, he summoned police who viewed weapons—held: no search subject to fourth amendment); *United States v. Sherwin*, 539 F.2d 1 (9th Cir. 1976) (en banc) (trucking terminal manager searched cartons of allegedly obscene materials before calling FBI agents who viewed and accepted possession of materials —held: no search of seizure subject to fourth amendment); *United States v. Sellers*, 511 F.2d 1199 (4th Cir. 1975) (wrecker

2. The court suppressed the evidence because the search was not justified under any of the recognized exceptions to the requirement of a warrant.

operator discovered firearms in automobile and summoned police to examine them—held: no fourth amendment violation).

We also conclude that there is no seizure within the meaning of the fourth amendment when an object discovered in a private search is voluntarily relinquished to the government. We believe this conclusion is dictated by *Coolidge v. New Hampshire, supra,* in which the Supreme Court held that the fourth amendment was not implicated when articles discovered in a private search were voluntarily turned over to the government. 403· U.S. at 488–89, 91 S.Ct. at 2049. Accordingly, the acceptance by the police of the briefcase containing the shotgun did not constitute a "seizure" as that term is used in the fourth amendment.

For the foregoing reasons the decision of the district court suppressing the evidence is reversed.