Joseph MIDDAUGH; Mary Middaugh; Michael Middaugh, Plaintiffs–Appellees,

v.

CITY OF THREE RIVERS, a public body, Defendant,

and

Eric Piper, Individually and in his official capacity as a police officer of the City of Three Rivers; Nathan Gipson, Individually and in his official capacity as a police officer of the City of Three Rivers, Defendants–Appellants.

No. 15–1140.

United States Court of Appeals, Sixth Circuit.

Oct. 26, 2015.

BEFORE: GUY, KETHLEDGE, and STRANCH, Circuit Judges.

## OPINION

JANE B. STRANCH, Circuit Judge.

This case concerns the involvement of two police officers in a family's dispute about a car. Joseph and Mary Middaugh and their nephew Michael allege that Officers Eric Piper and Nathan Gipson wrongfully seized their personal property without due process of law when they helped Joseph's sister-in-law Chrystal take the Middaughs' 1992 Buick from the driveway behind the Middaughs' home. Officers Piper and Gipson appeal from the district court's denial in part of their motion for summary judgment on the basis of qualified immunity. For the reasons set forth below, we **AFFIRM**.

## I. BACKGROUND

### A. Facts

The 1992 Buick at the center of this dispute changed ownership within the Middaugh family several times prior to the events in this case. Joseph first purchased the car in 2010, but he sold it to Chrystal's sister in 2011. Chrystal and her husband Lucky—who is Joseph's brother—later purchased the car themselves and then sold it back to Joseph in May of 2012. At that time, Lucky gave Joseph a bill of sale for the Buick and explained that he could not find the title.

Joseph did not immediately apply for a replacement title.

The family's first dispute over the Buick took place on or around May 18, 2012, after Lucky had given Joseph the bill of sale. Lucky went to Joseph and Mary's house and tried, unsuccessfully, to retake possession of the car, and Officer Piper was called to the scene. Joseph, who was not home at the time, spoke to a police dispatcher by phone and said that he had a bill of sale for the Buick and was on his way home to show it to Officer Piper. But Lucky and Officer Piper left the house before Joseph arrived. Joseph later saw Lucky drive by and decided to follow him. The brothers wound up at the Cook Agency, which insured the Buick, and Lucky and Joseph got into a fist fight. Officer Piper arrested Joseph a short time later. After several weeks, however, the brothers made peace and Lucky accompanied Joseph to the Secretary of State's office where Joseph applied for a replacement title to the car. The Secretary of State subsequently issued Joseph a title listing both himself and Mary as owners of the Buick.

The second dispute, which gives rise to the present case, occurred almost a year later. On April 5, 2013, Chrystal and a male friend went to the police station and spoke to Officer Gipson. Chrystal told Officer Gipson that she was divorcing Lucky and that her attorney had advised her to get the Buick titled in her name and to ask the police to provide security while she retrieved the vehicle from her brother-in-law Joseph's house. Chrystal showed Officer Gipson her keys to the Buick and a copy of a document entitled "Application for Michigan Vehicle Title" that she had obtained from the Secretary of State earlier that day, and Officer Gipson showed the document to Officer Piper. Chrystal told the Officers that there had been issues

regarding the car's ownership in the past, and she asked them to escort her to the Middaughs' house because she was afraid that someone might try to prevent her from taking the Buick and that the situation might turn violent.

Officer Piper drove Chrystal to the Middaughs' house in his patrol car and Officer Gipson followed in a second patrol vehicle. When they arrived, Officer Piper parked his patrol car on the Middaughs' property between the house and the Buick. Officer Gipson parked nearby. Both Officer Piper and Chrystal exited his patrol car, and Chrystal unlocked the Buick, started it, and drove away, taking personal property of Michael's that was inside the Buick with her. Officer Piper then returned to his patrol car, and he and Officer Gipson left the scene. Mary was home when the Officers arrived and she noticed the police cars pulling up, but because of the way the patrol cars were parked she could not see anyone getting into the Buick. She did not try to make contact with the Officers while they were briefly outside her home, but after they left and she saw that the Buick was gone, Mary called 911 to report that her car had been stolen.

Officer Gipson returned to the Middaughs' house in response to Mary's 911 call and Mary tried to show him her title to the Buick. But Officer Gipson refused to listen to Mary, saying Chrystal had proof of ownership. Joseph and Mary later spoke to a detective at the police station, Sergeant Mike Mahoney, who instructed Officer Piper to investigate the matter further. After reviewing the Middaughs' ownership paperwork, conferring with the Secretary of State's office, and checking state record systems, Officers Piper and Gipson concluded that the Middaughs were, indeed, the car's rightful owners. Sergeant Mahoney told the Officers to retrieve the Buick from Chrystal.

Chrystal returned the Buick to the police station at the Officers' request, but not until roughly three weeks after the incident. At that point, most of Michael's personal property was missing and the Buick itself was damaged.

## B. Procedural History

Joseph, Mary, and Michael filed the instant action in federal district court on August 20, 2013, against Officers Piper and Gipson and the City of Three Rivers. The three-count complaint alleges violations of the Fourth and Fourteenth Amendments under color of state law and municipal failure to train under 42 U.S.C. § 1983 (Counts I and II), as well as trespass and conversion under Michigan state law (Count III). On August 15, 2014, Officers Piper and Gipson and the City filed a motion for summary judgment with respect to all of the Middaughs' claims, and the Middaughs filed a motion for partial summary judgment regarding their claims against Officers Piper and Gipson. As relevant on appeal, Officers Piper and Gipson argued that their conduct did not violate the constitution and that, in any event, they were entitled to qualified immunity for their actions. The Middaughs disagreed on both fronts. On February 6, 2015, the court granted in part and denied in part the motion of the Officers and the City, and denied the Middaughs' motion. Specifically, the district court found that the Officers were not entitled to qualified immunity with respect to the constitutional claims but that all defendants were entitled to summary judgment on the Middaughs' remaining claims. Officers Piper and Gipson filed a timely notice of appeal from the court's denial of qualified immunity.

## II. STANDARD OF REVIEW

The Supreme Court has long recognized that 28 U.S.C. § 1291 "grants appellate

courts jurisdiction to hear appeals only from 'final decisions' of district courts[,]" and that "interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (quoting 28 U.S.C. § 1291). One such exception, under the "so-called collateral order[ ]" doctrine, provides for immediate appeals from district court orders denying qualified immunity. *Id.* at 310, 115 S.Ct. 2151 (discussing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)); *see also id.* at 311–12, 115 S.Ct. 2151. We have held, however, that "this exception is a narrow one." *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir.2008). An order denying "qualified immunity is immediately appealable" under the collateral order doctrine "only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" *Id.* (quoting *Johnson*, 515 U.S. at 317, 115 S.Ct. 2151). "We lack jurisdiction to review a summary judgment ruling on qualified immunity insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial." *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir.2015); *see also Roberson v. Torres*, 770 F.3d 398, 401–02 (6th Cir.2014).

■ Because Officers Piper and Gipson's appeal in the present case raises "the abstract or pure legal issue of whether the facts alleged by the [Middaughs] constitute a violation of clearly established law[,]" we have jurisdiction and review the district court's denial of summary judgment de novo. *Cochran v. Gilliam*, 656 F.3d 300, 305 (6th Cir.2011). In so doing, we consider only the facts as alleged by the Middaughs, including undisputed record evidence viewed in the light most favorable to them. *Id.* at 305–06; *see also Plumhoff v.* *Rickard,* —— U.S. ——, 134 S.Ct. 2012, 2017, 188 L.Ed.2d 1056 (2014).

## III. ANALYSIS

The Middaughs seek civil damages against Officers Piper and Gipson pursuant to 42 U.S.C. § 1983, which "provides a cause of action against any person who deprives an individual of federally guaranteed rights under color of state law." *Filarsky v. Delia*, —— U.S. ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). It is well established, however, that the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir.2012). The doctrine of qualified immunity is designed to balance "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Accordingly, courts "make[ ] two inquiries when resolving qualified immunity claims: (1) whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Cochran*, 656 F.3d at 306 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Courts may consider these questions in either order, *see Pearson*, 555 U.S. at 236, 129 S.Ct. 808 and, in the present case, we will address the constitutional violation question first.

## A. The Middaughs' Constitutional Rights

■ The Middaughs allege that by helping Chrystal take the Buick from the Middaughs' home, Officers Piper and Gipson violated the Middaughs' rights under the Fourth Amendment, which prohibits unreasonable searches or seizures, *see Soldal v. Cook Cnty.,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), and the Fourteenth Amendment, which protects against deprivation of property without due process of law, *see Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).[1] Under the Fourth Amendment, a property seizure "occurs when 'there is some meaningful interference with an individual's possessory interests in that property[,]' " *Soldal,* 506 U.S. at 61, 113 S.Ct. 538 (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)), and such a seizure is unlawful if it is found to be unreasonable, *see id.* at 71, 113 S.Ct. 538. Significantly for present purposes, the Fourth Amendment's prohibition on unreasonable seizures applies "only [to] governmental action" and not "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652. The Supreme Court has made clear, however, that governmental actors "can be held responsible for a private decision" if they have "exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

### 1. *State Action*

We have had multiple occasions to consider what level of police involvement transforms an otherwise private act of repossession into state action for constitutional purposes. *See, e.g., Hensley,* 693 F.3d at 689–91; *Cochran,* 656 F.3d at 306–08; *United States v. Coleman,* 628 F.2d 961, 963–65 (6th Cir.1980). Most recently, in *Hensley v. Gassman,* we explained that while "a police officer's presence during a repossession solely to keep the peace … is alone insufficient to convert the repossession into state action[,]" the scales may tip toward state action "as police involvement becomes increasingly important" to completing the repossession. *Hensley,* 693 F.3d at 689. Put another way, repossession cases "fall[ ] along a spectrum of police involvement" with "[d]e minimis police involvement not constituting state action … at one end" and active police "intervention or aid" comprising state action at the other. *Id.* at 690–91; *see also Barrett v. Harwood,* 189 F.3d 297, 302 (2d Cir. 1999). In *United States v. Coleman,* for example, we declined to find state action where police officers "parked down the street and around the corner[,]" "remained in their car[,]" and "neither encouraged nor directed" a private individual as he repossessed a debtor's truck. *Coleman,* 628 F.2d at 963, 964. We held that the police officers' "presence at the scene" in *Coleman* "was not an indispensable prerequisite for repossession of the truck" and that "[t]heir benign attendance was

---

1. The District Court analyzed both of the Middaughs' constitutional claims under a Fourth Amendment reasonableness standard, concluding that "[f]or purposes of this case, the inquiries under the Fourth and Fourteenth Amendments are the same." (R. 54, PageID 408.) The parties have not asked us to review this conclusion or to apply a different constitutional standard on appeal, and our analysis will focus on the Middaughs' Fourth Amendment claim.

not designed to assist [the private individual] in repossession ... rather, it was in furtherance of their official duties." *Id.* at 964. By contrast, in *Hensley v. Gassman*—which, like the present case, involved disputed possession of a Buick—we found state action where deputy sheriffs "arrived at the [scene] with, and at the request of" the would-be repossessor; got out of their official vehicle; "ordered" one of the plaintiffs "to move from between the Buick and the tow truck" as the plaintiff "was attempting to thwart the repossession"; "ignored [one plaintiff's] demands to leave the property" and another plaintiff's "protest and ... explanation" that the repossession was illegal; "told [the plaintiffs] that [the private individual] was taking the Buick"; and broke the Buick's front window, unlocked the doors, and forcibly removed one of the plaintiffs who had entered the car in an attempt to stop the repossession. *Hensley*, 693 F.3d at 691; *see also id.* at 692.

In the present case, Officers Piper and Gipson liken their involvement to the officers in *Coleman* and insist that "[t]heir role was simply that of a peacekeeper." (Appellants' Br. at 25.) Our case law recognizes a distinction, for purposes of state action, "between conduct designed to keep the peace and activity fashioned to assist in the repossession." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 995 (6th Cir.1994); *see also Coleman*, 628 F.2d at 964 (distinguishing "benign attendance" from conduct "designed to assist ... in repossession of the truck"). The district court found that "Officer Piper drove Chrystal to the Middaughs' residence in his patrol vehicle, while Officer Gipson followed in his patrol vehicle." (R. 54, PageID 406.) The court further found that "Officers Piper and Gipson arguably set a 'screen' to hide and protect Chrystal" as she took the car (*id.* at PageID 415) when "Officer Piper drove onto the Middaughs'

property and parked between the Buick and the residence, [and] Officer Gipson parked close by" (*id.* at PageID 414). "Absent such assistance from the officers," the court concluded, "it is unlikely that Chrystal would have taken the Buick." (*Id.* at PageID 415.)

The Officers maintain that their "only actions when Chrystal ... retrieved the Buick Roadmaster were to be present to prevent violence in the event of a confrontation" (Appellants' Br. at 25) and that they "acted only as observers" (*id.* at 31). But this argument ignores the undisputed fact that, unlike the officers in *Coleman*— who parked down the street and around the corner and remained in their patrol car at all times, *see* 628 F.2d at 963—Officer Piper drove Chrystal onto the Middaughs' property in his patrol car and exited his vehicle as Chrystal took the Buick. It also ignores the district court's finding that Piper and Gipson positioned their cars in a way that blocked the line of sight from the house to the Buick, thereby providing Chrystal with quick, easy, and protected access to the car. *See Cochran*, 656 F.3d at 308 (finding state action where deputy sheriffs, among other things, "interposed themselves between [a tenant] and the [l]andlords to allow the [l]andlords to take [the tenant's] property"); *see also Hensley*, 693 F.3d at 689 (noting that courts may find state action where "[a]n officer's conduct ... facilitate[s] a repossession"). Officers Piper and Gipson further rely on the fact that neither spoke to or directly interacted with the Middaughs while Chrystal took the car and argue that, under our case law, "[o]nly when an officer actively interferes or uses his authority to help the private party take the property does state action exist[.]" (Appellants' Br. at 26.) We noted in *Hensley*, however, that "[e]ven without active participation, courts have found that an officer's conduct

can facilitate a repossession if it chills the plaintiff's right to object." *Hensley*, 693 F.3d at 689; *see also id.* at 690 (collecting cases). And that appears to be part of what happened here: the district court found that the way Officers Piper and Gipson parked their patrol cars prevented Mary from seeing that Chrystal was taking the Buick until it was too late to protest.

Viewing the record in the light most favorable to plaintiffs, we agree with the district court that the Officers' conduct crossed the line from mere presence to active facilitation and assistance. Consequently, we affirm the district court's finding of state action.

### 2. *Fourth Amendment Prohibition Of Unreasonable Seizures*[2]

The Fourth Amendment reasonableness standard requires courts to inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). This inquiry "reflect[s] a careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71, 113 S.Ct. 538.

In the present case, the district court found that Chrystal never claimed to have a court order awarding her possession of the Buick, nor did she claim to be a creditor entitled to use self-help to repossess the car under state law. The district court also found that the Officers knew that ownership of the Buick was disputed because Chrystal told them as much and because Officer Piper was familiar with the family's first dispute over the car, having arrested Joseph after the first dispute turned violent. And the district court determined that the document Chrystal showed the Officers, an application for title, was itself suspect because the document said both that Chrystal's spouse had given her the vehicle and that Joseph—who Officer Piper knew was not Chrystal's spouse—had sold her the vehicle. Neither Officer verified Chrystal's ownership claim prior to assisting her efforts to seize the Buick, and when they did investigate after the fact, they quickly realized that Chrystal had no legal claim to ownership. In light of this record, we therefore affirm, as a matter of law, the district court's conclusion that Officers Piper and Gipson acted unreasonably in violation of the Middaughs' Fourth Amendment rights. *See Cochran*, 656 F.3d at 308 (noting that "police officers [who] take an active role in a seizure or eviction" generally "are not entitled to qualified immunity ... when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's in-

---

2. The parties do not dispute that Chrystal's actions amount to a "seizure" of the Buick under the Fourth Amendment; but Officers Piper and Gipson now argue that the seizure did not encompass the personal property inside the vehicle because there was no intent to acquire physical control over such property. It appears from the record, however, that Officers Piper and Gipson have presented this

argument for the first time on appeal. Accordingly, we decline to address the Officers' seizure argument at this time. *See Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir.1993) ("In general, issues not presented to the district court but raised for the first time on appeal are not properly before the court." (alteration omitted)).

terest would outweigh the individual's interest in his property").

## B. Clearly Established Rights

The second step of our qualified immunity analysis asks whether the rights at issue were clearly established at the time of the alleged violation. *See id.* at 306. "For a constitutional right. to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The central question is whether Officers Piper and Gipson had "fair warning" that their actions were unlawful, *id.* at 741, 122 S.Ct. 2508 meaning that the unlawfulness of the Officers' actions must have been apparent "in the light of pre-existing law[,]" *id.* at 739, 122 S.Ct. 2508. "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003). A court need not have held "the very action in question … unlawful[,]" *Hope,* 536 U.S. at 739, 122 S.Ct. 2508 for example, if "a general constitution rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question[,]" *id.* at 741, 122 S.Ct. 2508 (quoting *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

This court discussed the standard for government liability in seizure and eviction cases in 2011, prior to the events at issue in this case. Specifically, we recognized in *Cochran v. Gilliam* that "the standard has long been that" police officers are not liable for a private party's actions if the officers "merely stand by in case of trouble" and "neither encourage nor direct a private individual during a repossession," but that officers "may no longer be entitled to qualified immunity" in cases where they "take an active role in a seizure or eviction[.]" *Cochran,* 656 F.3d at 310 (citations omitted). Officers "cross the line" into state action, we noted, "if they affirmatively intervene to aid the repossessor." *Id.* Since 1994 our cases have "distinguished between conduct designed to keep the peace and activity fashioned to assist in the repossession" for purposes of qualified immunity. *Haverstick Enters., Inc.,* 32 F.3d at 995. In the present case, a reasonable official would have understood that the actions of Officers Piper and Gibson encouraged and assisted Chrystal's seizure of the Middaughs' property. Consequently, we hold that our reasoning in prior cases was sufficient to provide Officers Piper and Gipson with fair warning that their actions violated the Middaughs' Fourth Amendment rights. We therefore affirm the district court's ruling that the Middaughs' Fourth Amendment rights were clearly established.[3]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of qualified immunity and remand the case for further proceedings consistent with this opinion.

---

**3.** Because we agree with the district court's denial of qualified immunity with respect to the Middaughs' Fourth Amendment claim we need not analyze whether the Officers are entitled to qualified immunity with respect to the Middaughs' remaining constitutional claims. *See Cochran,* 656 F.3d at 311.