NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0193n.06

No. 15-1140

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOSEPH MIDDAUGH; MARY MIDDAUGH; MICHAEL MIDDAUGH, | ) ) ) | **FILED** Mar 29, 2017 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| CITY OF THREE RIVERS, a public body, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| Defendant, | ) ) | |
| and | ) ) | OPINION |
| ERIC PIPER, Individually and in his official capacity as a police officer of the City of Three Rivers; NATHAN GIPSON, Individually and in his official capacity as a police officer of the City of Three Rivers, | ) ) ) ) ) ) ) | |
| Defendants-Appellants. | ) | |

**BEFORE:** GUY, KETHLEDGE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Joseph and Mary Middaugh and their nephew Michael filed suit against the City of Three Rivers and Police Officers Eric Piper and Nathan Gipson raising claims under 42 U.S.C. § 1983 and Michigan law. The Middaughs alleged that Officers Piper and Gipson wrongfully seized their personal property without due process of law when they helped Joseph's sister-in-law Chrystal take the Middaughs' 1992 Buick from the driveway behind the Middaughs' home. The district court denied in part the Officers' motion for

summary judgment on the basis of qualified immunity. The Officers filed a timely appeal, and we affirmed. *See Middaugh v. City of Three Rivers*, 629 F. App'x 710, 718 (6th Cir. 2015).

The Officers filed a petition for a writ of certiorari, and the Supreme Court issued a grant, vacate, and remand order (GVR)—granting the Officers' petition, vacating our opinion, and remanding the case to this court for further consideration in light of *Mullenix v. Luna*, 577 U.S. ---, 136 S. Ct. 305 (2015) (per curiam), which the Supreme Court decided after we issued our opinion. *See Piper v. Middaugh*, 136 S. Ct. 2408 (2016) (mem.). "[O]ur law is clear that a GVR order does not necessarily imply that the Supreme Court has in mind a different result in the case, nor does it suggest that our prior decision was erroneous." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) (collecting cases). Rather, our task following the GVR in this case is to "determine whether our original decision to affirm the [qualified immunity] order was correct or whether [*Mullenix*] compels a different resolution." *Id.* Upon reconsideration, we find that *Mullenix* has some impact on the resolution of this case and **REVERSE** the district court's denial of qualified immunity.

## I. BACKGROUND

The 1992 Buick at the center of this dispute changed ownership within the Middaugh family several times prior to the events in this case. Joseph first purchased the car in 2010, but he sold it to Chrystal's sister in 2011. Chrystal and her husband Lucky—who is Joseph's brother—later purchased the car themselves and then sold it back to Joseph in May of 2012. At that time, Lucky gave Joseph a bill of sale for the Buick and explained that he could not find the title. Joseph did not immediately apply for a replacement title.

The family's first dispute over the Buick took place on or around May 18, 2012, after Lucky had given Joseph the bill of sale. Lucky went to Joseph and Mary's house and tried,

unsuccessfully, to retake possession of the car, and Officer Piper was called to the scene. Joseph was not home at the time, but he spoke to a police dispatcher by phone and said that he had a bill of sale for the Buick and was on his way home to show it to Officer Piper. But Lucky and Officer Piper left the house before Joseph arrived and did not take the Buick. Joseph later followed Lucky to the Cook Agency, which insured the Buick, and Lucky and Joseph got into a fist fight in the parking lot. Officer Piper arrested Joseph a short time later as a result of the fight. After several weeks the brothers made peace and Lucky accompanied Joseph to the Secretary of State's office where Joseph applied for a replacement title. The Secretary of State issued a title listing Joseph and Mary as the owners of the Buick.

The second dispute, which gave rise to the present case, occurred almost a year later. On April 5, 2013, Chrystal and a male friend went to the police station and spoke to Officer Gipson. Chrystal told Officer Gipson that she was divorcing Lucky and that her attorney had advised her to get the Buick titled in her name and to ask the police to provide security while she retrieved the vehicle from her brother-in-law Joseph's house. Chrystal showed Officer Gipson her keys to the Buick and a copy of a document entitled "Application for Michigan Vehicle Title" that she had obtained from the Secretary of State earlier that day, and Officer Gipson showed the document to Officer Piper. Chrystal told the Officers that there had been issues regarding the car's ownership in the past, and she asked them to escort her to the Middaughs' house because she was afraid that someone might try to prevent her from taking the Buick and that the situation might turn violent.

Officer Piper drove Chrystal to the Middaughs' house in his patrol car and Officer Gipson followed in a second patrol car. When they arrived, Officer Piper parked his patrol car on the Middaughs' property between the house and the Buick. Officer Gipson parked nearby.

Both Officer Piper and Chrystal exited his patrol car, and Chrystal unlocked the Buick, started it, and drove away, taking personal property of Michael's that was inside the Buick with her. Officer Piper then returned to his patrol car, and he and Officer Gipson left the scene. Mary was home when the Officers arrived and she noticed the patrol cars pulling up, but because of the way the patrol cars were parked she could not see anyone getting into the Buick. She did not try to make contact with the Officers while they were briefly outside her home, but after they left and she saw that the Buick was gone, Mary called 9-1-1 to report that her car had been stolen.

Officer Gipson returned to the Middaughs' house in response to Mary's 9-1-1 call and Mary tried to show him her title to the Buick. But Officer Gipson refused to listen to Mary, saying Chrystal had proof of ownership. Joseph and Mary later spoke to a detective at the police station, Sergeant Mike Mahoney, who instructed Officer Piper to investigate the matter further. After reviewing the Middaughs' ownership paperwork, conferring with the Secretary of State's office, and checking state record systems, Officers Piper and Gipson concluded that the Middaughs were, indeed, the rightful owners of the car. Sergeant Mahoney told the officers to retrieve the Buick from Chrystal. Chrystal returned the Buick to the police station at the Officers' request, but not until roughly three weeks after the incident. At that point, most of Michael's personal property was missing and the Buick itself was damaged.

## II.    JURISDICTION & STANDARD OF REVIEW

Congress "grants appellate courts jurisdiction to hear appeals only from 'final decisions' of district courts[,]" and "interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309 (1995) (quoting 28 U.S.C. § 1291). One such exception, the "so-called collateral order[]" doctrine, provides for immediate appeals from district court orders denying qualified immunity. *Id.* at 310

(discussing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)); *see also id.* at 311–12. This exception is a narrow one. *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008). An order denying "qualified immunity is immediately appealable" under the collateral order doctrine "only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" *Id.* (quoting *Johnson*, 515 U.S. at 317). "We lack jurisdiction to review a summary judgment ruling on qualified immunity insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial." *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015).

Because the Officers' appeal raises "the abstract or pure legal issue of whether the facts alleged by the [Middaughs] constitute a violation of clearly established law," we have jurisdiction and review the district court's denial of summary judgment de novo. *Cochran v. Gilliam*, 656 F.3d 300, 305 (6th Cir. 2011). We consider only the facts as alleged by the Middaughs, including undisputed record evidence viewed in the light most favorable to them. *Id.* at 305–06; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014).

## III. ANALYSIS

The Middaughs seek civil damages against the Officers pursuant to 42 U.S.C. § 1983, which "provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). At the same time, the doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012). The doctrine of qualified immunity is designed to balance "the need to hold public officials

accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Courts make "two inquiries when resolving qualified immunity claims: (1) whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Cochran*, 656 F.3d at 306 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may consider these questions in either order. *See Pearson*, 555 U.S. at 236. The Supreme Court's opinion in *Mullenix* addressed only the second question. 136 S. Ct. at 308. Here, we address the constitutional violation question first and then proceed to a discussion of *Mullenix* and whether the rights at issue were clearly established.

### A. The Middaughs' Constitutional Rights

The Middaughs allege that, by helping Chrystal take the Buick from the Middaughs' home, the Officers violated the Middaughs' rights under the Fourth Amendment, which prohibits unreasonable searches or seizures.[1] *See Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992). The parties do not dispute that Chrystal's actions amount to a "seizure" of the Buick,[2] but the Fourth

---

[1] The Middaughs also allege a violation of the Fourteenth Amendment, which protects against deprivation of property without due process of law. *See Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972). The District Court analyzed both of the Middaughs' constitutional claims under a Fourth Amendment reasonableness standard, concluding that here the Fourth and Fourteenth Amendment claims involve the same inquiry. The parties have not asked us to review this conclusion or to apply a different constitutional standard on appeal, and our analysis will focus on the Middaughs' Fourth Amendment claim.

[2] The Officers argue that the seizure did not encompass the personal property inside the vehicle because there was no intent to acquire physical control over such property. It appears from the record, however, that the Officers presented this argument for the first time on appeal. Accordingly, we decline to address it. *See Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993)

Amendment's prohibition on unreasonable seizures applies "only [to] governmental action." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Governmental actors "can be held responsible for a private decision" if they have "exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Therefore, to have violated the Fourth Amendment, the officers' conduct would need to have been both (1) sufficient to transform the private repossession into state action and (2) unreasonable.

### 1.      State Action

We have had multiple occasions to consider what level of police involvement transforms an otherwise private act of repossession into state action for constitutional purposes. *See, e.g.*, *Hensley*, 693 F.3d at 689–91; *Cochran*, 656 F.3d at 306–08; *United States v. Coleman*, 628 F.2d 961, 963–65 (6th Cir. 1980). Most recently, in *Hensley*, we explained that repossession cases fall "along a spectrum of police involvement" from "[*d*]*e minimis* police involvement not constituting state action" to active police "intervention or aid" sufficient for state action. 693 F.3d at 690–91; *see also Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999). The scales tip toward state action "as police involvement becomes increasingly important" to completing the repossession. *Hensley*, 693 F.3d at 689. To determine whether an officer's conduct transforms a private repossession into state action, our cases have looked for decades to the purpose and effect of the conduct, "distinguish[ing] between conduct designed to keep the peace and activity fashioned to assist in the repossession." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 995 (6th Cir. 1994).

---

("In general, issues not presented to the district court but raised for the first time on appeal are not properly before the court." (alteration omitted)).

We recognize that "a police officer's presence during a repossession solely to keep the peace . . . is alone insufficient to convert the repossession into state action." *Hensley*, 693 F.3d at 689. "[T]he standard has long been that" police officers are not liable for a private party's actions if the officers "merely 'stand by in case of trouble.'" *Cochran*, 656 F.3d at 310 (quoting *Coleman*, 628 F.2d at 964)). In *Coleman*, for example, we declined to find state action where police officers "parked down the street and around the corner," "remained in their car," and "neither encouraged nor directed" a private individual as he repossessed a debtor's truck. *Coleman*, 628 F.2d at 963, 964. We held that the police officers' "presence at the scene" in *Coleman* "was not an indispensable prerequisite for repossession of the truck" and that "[t]heir benign attendance was not designed to assist [the private individual] in repossession . . . rather, it was in furtherance of their official duties." *Id.* at 964.

Officers "cross the line" into state action when they "take an active role in a seizure or eviction," *Cochran*, 656 F.3d at 310, and "affirmatively intervene to aid the repossessor," *id.* (quoting *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004)). In *Hensley*, decided in 2012, we held that deputy sheriffs crossed this line when they: "arrived at the Hensley residence with, and at the request of" the would-be repossessor; got out of their official vehicle; "ordered" one of the plaintiffs "to move from between the Buick and the tow truck" as the plaintiff "was attempting to thwart the repossession"; "ignored [one plaintiff's] demands to leave the property" and another plaintiff's "protest and . . . explanation" that the repossession was illegal; "told [the plaintiffs] that [the private individual] was taking the Buick"; and broke the Buick's front window with a handgun, unlocked the doors, and forcibly removed one of the plaintiffs who had entered the car in an attempt to stop the repossession. 693 F.3d at 691–92. In *Cochran*, we

found state action when officials themselves entered the plaintiff's home and carried out his property, and allegedly threatened to arrest the plaintiff if he interfered. 656 F.3d at 308.

We turn to the facts of this case. Unlike in *Coleman*, where the officers parked around the corner from the events and stayed in their cars, Officer Piper drove Chrystal onto the Middaughs' property in a patrol car and exited the vehicle. The district court found that this difference, plus the fact that "Officers Piper and Gipson arguably set a 'screen' to hide and protect Chrystal" as she took the car, constituted more than simply keeping the peace. *Middaugh v. City of Three Rivers*, No. 1:13–CV–909, 2015 WL 505793, at *7 (W.D. Mich. Feb. 6, 2015). According to the district court, "[a]bsent such assistance from the officers, it is unlikely that Chrystal would have taken the Buick." *Id.*

In *Cochran* we noted that one of the facts contributing to our finding of state action was that the officials there "interposed themselves between Cochran and the [l]andlords to allow the [l]andlords to take Cochran's property." *Cochran*, 656 F.3d at 308; *see also Hensley*, 693 F.3d at 689 (noting that courts may find state action where "[a]n officer's conduct . . . facilitate[s] a repossession"). Similarly, Officer Piper interposed himself between the Middaugh home and the Buick, blocking Mary's view and providing Chrystal with easy, protected access to the car. Mary did see the patrol cars, but did not exit the house or call 9-1-1 until the officers left and she could see that the Buick was gone. These facts might suggest that the way Officer Piper drove onto the Middaughs' property and placed himself and his patrol car between Mary and the Buick deterred Mary from voicing objection. As we noted in *Hensley*, "[e]ven without active participation, courts have found that an officer's conduct can facilitate a repossession if it chills the plaintiff's right to object." 693 F.3d at 689; *see also id.* at 690 (collecting cases).

We find that the Officers' conduct crossed the line, rendering the repossession state action. By driving Chrystal onto the Middaughs' property and enabling her to seize the car without objection, the Officers "affirmatively intervene[d] to aid the repossessor." *Cochran*, 656 F.3d at 310 (quoting *Marcus*, 394 F.3d at 818). Thus, the Officers' conduct was sufficient for state action.

### 2. Unreasonableness

The Fourth Amendment reasonableness standard requires courts to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) ("[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). This inquiry "reflect[s] a careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71.

The district court found that Chrystal never claimed to have a court order awarding her possession of the Buick, nor did she claim to be a creditor entitled to use self-help to repossess the car under state law. The district court also found that the Officers knew that ownership of the Buick was disputed because Chrystal told them as much and because Officer Piper had arrested Joseph after the first dispute over the same car. Furthermore, the document Chrystal showed the Officers, an application for title, was itself suspect because the document said both that Chrystal's spouse had given her the vehicle and that Joseph—who Officer Piper knew was not Chrystal's spouse—had sold her the vehicle. Neither Officer verified Chrystal's ownership claim prior to assisting her efforts to seize the Buick. When they did investigate after the fact, they quickly realized that Chrystal had no legal claim to ownership.

In light of this record, we affirm as a matter of law the district court's conclusion that the Officers acted unreasonably in violation of the Middaughs' Fourth Amendment rights. *See Cochran*, 656 F.3d at 308 (noting that "police officers [who] take an active role in a seizure or eviction" generally "are not entitled to qualified immunity . . . when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's interest would outweigh the individual's interest in his property").

### B.       Clearly Established Rights

Having determined that the seizure here violated the Middaughs' Fourth Amendment rights, we must now determine whether those rights were clearly established at the time. If the officers' particular conduct did not clearly violate such rights under then-existing precedent, the officers are protected from liability by qualified immunity.

In *Mullenix*—an excessive force case under the Fourth Amendment involving a police chase and fatal shooting—the Supreme Court reiterated that "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). Showing that a right is clearly established "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). *Mullenix* emphasized that for qualified immunity purposes, clearly established law must be defined specifically, not "at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" *id.* (emphasis added by *Mullenix*) (quoting *al-Kidd*, 563 U.S. at 742), and courts must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition," *id.* (quoting *Brosseau v.*

*Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "Such specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier*, 533 U.S. at 205). In sum, *Mullenix* instructs that the qualified immunity inquiry must be formulated not based on general principles, but rather on officers' specific conduct, especially in the Fourth Amendment context.

Whether the Middaughs' rights were clearly established depends on the "objective legal reasonableness" of the Officers' specific conduct. *Cochran*, 656 F.3d at 306 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). This fact-specific analysis asks whether reasonable officials in the Officers' positions could have believed that their conduct was lawful at the time. *Id.* We look to the totality of the circumstances here in light of then-existing precedent. For example, although we find the Officers' conduct here more similar to the physical interventions in *Cochran* and *Hensley* than the distant observation in *Coleman*, the conduct in both *Cochran* and *Hensley* includes some substantive distinctions from the Officers' conduct here. In those two cases, the officers engaged in direct confrontations with the plaintiffs. The officials in *Cochran* threatened to arrest the plaintiff, and in *Hensley* an official brandished his handgun, broke a car window, and pulled the plaintiff out of her car. Although the Officers here came onto the Middaughs' property, parked a patrol car between the Buick and the Middaughs' home, and stayed until Chrystal left with the Buick, the Officers neither threatened arrest nor used force. They had no direct interaction with the Plaintiffs. In light of the analysis in *Mullenix*, we find it not beyond debate that reasonable officers in their position could have believed their conduct was lawful under then-existing precedent.

It is important to note that *Mullenix* does "not require a case directly on point," 136 S. Ct. at 308, and "the very action in question" need not have "previously been held unlawful," *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). For example, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). *Mullenix* does not undermine our circuit's longstanding holding that "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). However, there is sufficient daylight between the Officers' conduct here and the conduct in *Cochran* and *Hensley* that those precedents may not "apply with obvious clarity to [this] specific conduct." *Hope*, 536 U.S. at 739 (quoting *Lanier*, 520 U.S. at 271). Therefore, Officers Piper and Gipson are entitled to qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of qualified immunity and remand the case for further proceedings consistent with this opinion.